**In re VP ENERGY, INC., Debtor.**

**VP Energy, Inc., Plaintiff,**

**v.**

**Williams Energy Marketing and Trading Company and Volunteer Williams, L.L.C., Defendants.**

**Bankruptcy No. 00–29909–MBM.
Adversary No. 02–2126–MBM.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Oct. 28, 2003.

Roger Martin Bould, Ronald B. Roteman, Campbell & Levine, LLC, Pittsburgh, PA, for debtor.

Amy E. Dias, Donald M. Lund, Jones, Day, Reavis & Pogue, Pittsburgh, PA, for defendants.

Joseph M. Fornari, Jr., Pittsburgh, PA, U.S. Trustee.

Craig B. Young, Andrews & Kurth L.L.P., Elaine L. Farris, Washington, DC, George L. Cass, Buchanan Ingersoll, P.C., Jeffery A. Deller, Klett Rooney Lieber & Schorling, Pittsburgh, PA, for Official Committee of Unsecured Creditors.

### MEMORANDUM AND ORDER OF COURT

M. BRUCE McCULLOUGH, Bankruptcy Judge.

**AND NOW**, this **28th day** of **October, 2003**, upon consideration of (a) the amended adversary complaint of VP Energy,

Inc., the instant debtor-in-possession (hereafter "the Debtor"), wherein the Debtor (i) brings, via Counts 1—3 therein, three actions that are characterized by the Debtor as turnover actions, (ii) brings, via Count 4 therein, a successor liability action so as to hold Williams Energy Marketing and Trading Company and Volunteer Williams, L.L.C., the instant defendants (hereafter "the Defendants"), liable for the relief that it seeks via its first three counts, and (iii) objects to two proofs of claim filed by the Defendants (hereafter "the Proofs of Claim"), (b) the answer of the Defendants, as well as the counter-complaint of the Defendants, wherein are raised three counterclaims in which nothing more is sought in the way of relief than that which is sought via the Proofs of Claim, (c) the motion by the Defendants for summary judgment regarding each of the four counts of the Debtor's amended complaint, as well as with respect to the third count of the Defendants' counter-complaint (hereafter "Counterclaim 3"),[1] and (d) the various documents submitted by the parties as exhibits in support of, and in opposition to, the instant summary judgment motion; and subsequent to notice and a hearing held on August 27, 2003, regarding the instant summary judgment motion, it is now **hereby ORDERED, ADJUDGED, AND DECREED** that:

 (a) the Court possesses **CORE SUBJECT MATTER JURISDICTION** over (i) each of the four counts brought within the Debtor's amended complaint, as well as the Debtor's objection to the Proofs of Claim contained within such complaint, (ii) the entirety of the counter-complaint of the Defendants, and (iii) the Proofs of Claim,

 (b) the Defendants' summary judgment motion is **GRANTED** with respect to (i) the Debtor's Count 1, and (ii) the Debtor's Count 3 but only to the extent of $328,783.58—i.e., 80%—of the relief that is sought therein, and

 (c) the Defendants' summary judgment motion is **DENIED WITH PREJUDICE** with respect to (i) the Debtor's Count 2 and 4, (ii) the Debtor's Count 3 to the extent of $82,195.90—i.e., 20%—of the relief that is sought therein, and (iii) the Defendants' Counterclaim 3.

The rationale for the Court's decision is set forth below.

### I.

 The Court does not identify any real issue as to its subject matter jurisdiction over any of the matters raised in the instant adversary proceeding except for the extent of such jurisdiction, that is whether such matters constitute core or noncore proceedings. Therefore, the Court shall confine its subsequent discussion to the core/noncore issue. That the Proofs of Claim and the Debtor's objection thereto constitute core proceedings follows easily from 28 U.S.C. § 157(b)(2)(B). As for the counter-complaint of the Defendants, the matters raised therein constitute core matters, pursuant to § 157(b)(2)(B) as well, given that (a) the substance of such counter-complaint mirrors in its entirety the substance of the Proofs of Claim, and (b) the Proofs of Claim, as set forth in the preceding sentence, are the subject of an objection over which the Court possesses core subject matter jurisdiction.

---

**1.** The Defendants do not presently seek summary judgment with respect to the first two counts of their counter-complaint.

■ Regarding the matters raised within each of the four counts of the Debtor's amended complaint, the Court holds that the same constitute core matters, and notwithstanding the Court's determination that, the contrary pleas of the Debtor notwithstanding, none of the first three of such counts constitute core turnover actions within the meaning of 11 U.S.C. § 542(b) and 28 U.S.C. § 157(b)(2)(E). As an initial matter, the Court concludes that such counts plead something other than turnover actions within the meaning of 11 U.S.C. § 542(b) and 28 U.S.C. § 157(b)(2)(E) because (a) the Debtor, via such counts, seeks to liquidate disputed contract claims between itself and the Defendants, and (b) "[t]urnover proceedings [brought under § 542(b)] are not to be used to liquidate disputed contract claims," *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir.1990); *see also In re Allegheny Health, Education & Research Foundation*, 233 B.R. 671, 677–678 (Bankr. W.D.Pa.1999) ("turnover actions [brought] under § 542[(a)] cannot be used 'to demand assets whose title is in dispute'"). The Court holds that the Debtor's four counts nevertheless raise core matters because (a) the substance of each of the Debtor's four counts arises entirely out of the transactions or occurrences that are the subject matter of the Proofs of Claim, (b) the filing of the Proofs of Claim significantly predate the Debtor's filing of its complaint and amended complaint, (c) each of the Debtor's four counts consequently constitutes, in essence, a counterclaim—indeed, a compulsory counterclaim—to the Proofs of Claim, (d) "[c]ore proceedings include … counterclaims by the estate against persons filing claims against the estate," 28 U.S.C.A. § 157(b)(2)(C) (West 1993), and (e) the matters raised within the Debtor's four counts consequently constitute core matters pursuant to § 157(b)(2)(C). The Court notes that its ruling that the four counts of the Debtor's amended complaint constitute counterclaims to the Proofs of Claim is not affected by the fact that the Debtor denotes its claims as counts to its own complaint rather than counterclaims in response to the Proofs of Claim because a debtor in possession may, as a method of pleading a counterclaim, commence a new adversary proceeding, *see* Fed.R.Bankr.P. 7013, 11 U.S.C.A. (West 2003) (last sentence), which methodology the Court finds the Debtor has utilized, albeit not in a straightforward manner, in the instant matter. It is also immaterial to the Court's ruling that the Debtor seeks monetary relief in excess of that which is sought within the Proofs of Claim because "[a] counterclaim … may claim relief exceeding in amount … that [which is sought] in the pleading of the opposing party." Fed.R.Civ.P. 13(c), 28 U.S.C.A. (West 1992) (made applicable by Fed.R.Bankr.P. 7013).

## II.

■ The Debtor, in its Count 1, seeks a reduction of $3,947.06 in the initial purchase price (hereafter "the Initial Purchase Price") that it paid to the Defendants' predecessor (hereafter also referred to as "the Defendants"), pursuant to the Stock Purchase Agreement as amended by the parties' March 26, 1999 letter (hereafter "the Stock Purchase Agreement"), for the Defendants' 80% ownership interest in Volunteer–Phoenix Energy, Inc. (hereafter "Volunteer–Phoenix"). The Court does not understand the Debtor to dispute—indeed, the Court does not understand how the Debtor could dispute—that it paid $2,855,763 as the Initial Purchase Price on April 1, 1999 (hereafter sometimes referred to as "the Closing Date").

The Debtor contends that it is entitled to such price reduction (a) because the Initial Purchase Price indisputably was to

be computed by applying against the sum of $3,600,000 the product of .80 and the amount of Volunteer–Phoenix' retained earnings as of January 31, 1999—i.e., $3,600,000 + (.8 × 1/31/99 R/E), *see* Ex. 7 to Defs.' Summ. J. Mot.—Stock Purchase Agreement ¶¶ 1.2 & 1.2.1; Ex. 8 to Defs.' Summ. J. Mot.—March 26, 1999 Letter between Parties, (b) because, given that the Initial Purchase Price was calculated to be $2,855,763, Volunteer–Phoenix' 1/31/99 retained earnings must have been—and, in fact, it was—calculated as of the Closing Date to equal $(930,296.25), *see* March 26, 1999 Letter between Parties— Attached Closing Statement, (c) because, according to the Debtor, such retained earnings figure of $(930,296.25) was overstated by $4,933.83, which overstatement, according to the Debtor, thus resulted in the Debtor paying $3,947.06 more than it should have initially paid for the purchase of the 80% ownership interest in Volunteer–Phoenix, and (d) pursuant to, it would appear, paragraph 1.2.1 of the Stock Purchase Agreement, which paragraph therein provides for certain adjustments to be made to Volunteer–Phoenix' retained earnings as of January 31, 1999, and March 31, 1999.

The Court concludes that such price reduction as sought by the Debtor is utterly pointless and, more importantly, is not authorized by any provision in the Stock Purchase Agreement. The Court concludes as it does in the preceding sentence because the Court concludes, in turn, that (a) the Initial Purchase Price is indisputably nothing more than an interim amount that the Debtor was to pay the Defendants for their 80% ownership interest in Volunteer–Phoenix, after which payment a settlement was to indisputably occur between the parties based upon the difference between the Initial Purchase Price and a subsequently-to-be-computed—and independently determined—final total price

that the Debtor was to ultimately pay for such ownership interest (hereafter "the Final Purchase Price"), *see* Stock Purchase Agreement ¶ 1.2.2, (b) the Final Purchase Price indisputably was to be calculated by either (i) adding to the Initial Purchase Price an amount equal to the product of .80 and the amount by which Volunteer– Phoenix' retained earnings improved between January 31, 1999, and March 31, 1999, or (ii) subtracting from the Initial Purchase Price an amount equal to the product of .80 and the amount by which Volunteer–Phoenix' retained earnings decreased between January 31, 1999, and March 31, 1999, *see* Stock Purchase Agreement ¶ 1.2.2, (c) to grant a reduction in the Initial Purchase Price as sought by the Debtor would necessarily likewise produce, from the Debtor's point of view, a precisely inverse, or offsetting, effect on the settlement between the parties predicated upon the difference between the Initial Purchase Price and the Final Purchase Price—i.e., a $3,947.06 reduction in the Initial Purchase Price would result in either a $3,947.06 increase in the settlement amount due from the Debtor to the Defendants or a $3,947.06 decrease in the settlement amount due to the Debtor from the Defendants, (d) to grant such price reduction as sought by the Debtor would thus be meaningless, and (e) paragraph 1.2.1 of the Stock Purchase Agreement, which paragraph, as set forth above, calls for certain adjustments to be made to Volunteer–Phoenix' retained earnings, contemplates, the Court concludes as a matter of law, not meaningless retained earnings adjustments but instead only those retained earnings adjustments that would affect the total purchase price that the Debtor was to pay in return for the aforesaid 80% ownership interest.

Because the reduction to the Initial Purchase Price sought by the Debtor in its

Count 1 is utterly pointless and, more importantly, is thus not authorized by any provision in the Stock Purchase Agreement, the Defendants are entitled to a judgment in their favor on such count as a matter of law. Furthermore, because no facts are in dispute that the Court determines are relevant to a resolution of the Debtor's Count 1, the Defendants are entitled to the entry of a summary judgment in their favor regarding such count, thereby dictating the grant of their summary judgment motion with respect to such count.

### III.

■ The Debtor, in its Count 2, seeks the recovery of amounts from the Defendants for what it characterizes as various post-closing transactions, to wit:

(a) Costs and expenses which the Debtor paid after the Closing Date that the Debtor contends should have been paid by the Defendants prior to the Closing Date—the Debtor asserts in ¶ 24(c) of its Amended Complaint that such costs and expenses total $746,648.89, while the Defendants aver that the same total equals $807,525.28, which averment by the Defendants is not all that strange given that an apparent internal schedule of the Debtor's accounts payable as of March 31, 1999, indicates that the total of such costs and expenses equals $807,525.28, *see* Ex. 13 to Defs.' Summ. J. Mot.;

(b) $229,193.77 for what the parties refer to as various "LDC balancing adjustments" that were received by the Defendants but which, according

to the Debtor, should have been paid over to the Debtor after the Closing Date;

(c) $877,977.94 for accounts receivable of the Debtor allegedly generated after the Closing Date but which were apparently collected by the Defendants after the Closing Date; and

(d) $12,064.83 for certain credits taken by customers of the Debtor that the Debtor contends should properly be chargeable to the Defendants.

The Debtor, within its Count 2, at ¶ 25 of its Amended Complaint, concedes that it owes the Defendants:

(a) $1,120,365.90 for accounts receivable of the Debtor allegedly generated prior to the Closing Date which were apparently collected by the Debtor after the Closing Date, and

(b) $30,234.05 for other amounts paid by customers of the Debtor after the Closing Date which are apparently properly due the Defendants.

The Court cannot, and thus will not, grant summary judgment in favor of the Defendants regarding the costs and expenses which the Debtor paid after the Closing Date that the Debtor contends should have been paid by the Defendants prior to the Closing Date because, *inter alia*, the parties dispute, and the Court cannot presently resolve what it identifies to be contractual ambiguities relevant to the issue of, whether ¶¶ 2.3.4 & 2.3.6 of the Stock Purchase Agreement, as well as § 4.1 of a document entitled "Operating Agreement" (hereafter "the Operating Agreement"),[2] support the Debtor's position. The Court is also cognizant of the Debtor's position that the $619,575.39 of

2. The Operating Agreement sets forth many of the terms for the operation of Volunteer–Phoenix prior to its sale to the Debtor, and the parties to such document included (a) Volunteer–Phoenix, (b) the Defendants, who owned 80% of Volunteer–Phoenix, and (c) an entity that, as the Court understands it, at the time when the Operating Agreement was executed owned the remaining 20% of Volunteer–Phoenix.

"Transportation Expenses" that comprise a portion of the costs and expenses in question are recoverable by the Debtor on the basis that such amount was collected by the Defendants from the Debtor's customers as part of the normal billing process regarding such customers, which amount should then have been paid over to third party utility providers since it represented the cost of a service which such providers, and not the Defendants, provided to such customers—in other words, argues the Debtor, the Defendants pocketed $619,575.39 for which they never provided any goods or services. The Court cannot resolve by way of a summary judgment motion the dispute which the Court can only presume exists regarding the correctness of the position by the Debtor referred to in the previous sentence because evidence to disprove such position, not surprisingly, has not yet been produced by the Defendants. However, the Court notes that such dispute may ultimately prove to be immaterial if it is subsequently determined that, as part of the settlement process post-Closing Date regarding the Stock Purchase Agreement, the Defendants have either not sought payment from, or have not yet been paid by, the Debtor for other amounts that they are properly due which total at least $619,575.39—it appears to the Court, in fact, that the Defendants plead the existence of such an amount due them by way of such settlement process by way of the Defendants' Proof of Claim in the amount of $808,925.86, coupled with detail regarding such proof of claim as set forth in Exhibit 3 to the Defendants' answer and counter-complaint. Likewise, pursuit by the Debtor of its claim regarding the balance of the costs and expenses in question—i.e., $807,525.28 less $619,575.39, or $187,949.89—may ultimately prove to be futile if, by virtue of the contractual provisions in question and, in particular, § 4.1 of the Operating Agreement, the Defendants are entitled to a claim back against the Debtor for reimbursement of any costs and expenses for which they might be found liable. As for the Defendants' argument that summary judgment in their favor is appropriate with respect to at least 80% of the costs and expenses in question because to allow the Debtor to recover such costs and expenses would simultaneously operate to increase Volunteer–Phoenix' 3/31/99 retained earnings in a like amount, thereby increasing the Initial Purchase Price by .8 × such retained earnings increase, the Court must reject such argument outright. The Court must reject the Defendants' argument as just recounted in the preceding sentence because (a) the only reason why Volunteer–Phoenix' 3/31/99 retained earnings would be increased correspondingly by the Defendants' payment of the costs and expenses in question is if the Defendants were not obligated to pay the same but nevertheless paid, or were compelled to make, such payment—i.e., if the Defendants made, or were compelled to make, in essence a charitable contribution to the Debtor, (b) the Court will not compel the Defendants to pay such costs and expenses if the Defendants are not obligated to pay them, and (c) the Debtor, most importantly, contends, contrary to the position of the Defendants, that they are liable for the payment of such costs and expenses.

As for the $877,977.94 in post-Closing Date accounts receivable that were collected by the Defendants after the Closing Date and which are now allegedly due the Debtor, the Court understands the Defendants to argue that (a) they credited such amount in the Debtor's favor against a much larger amount due them from the Debtor, thereby resulting in a net amount payable to them from the Debtor of apparently $17,482,650.57 as set forth in Exhibit

3 to the Defendants' answer and counter-complaint, which amount is sought by the Defendants as part of their Proof of Claim in the amount of $808,925.86, (b) if the Debtor were to now receive a recovery of the $877,977.94 figure from the Defendants, then the $17,482,650.57 amount due them from the Debtor would grow by a like amount—i.e., to $18,360,628.51, and (c) they are, thus, entitled to the entry of a summary judgment in their favor regarding such $877,977.94 amount as the net effect of the recovery sought by the Debtor with respect to such amount would equal $0.00. The Court cannot quarrel with the analysis of the Defendants as just recounted in the preceding sentence provided, of course, that such crediting of the $877,977.94 amount by the Defendants as they allege has actually occurred. Unfortunately for the Defendants, the Court cannot, and thus will not, resolve by way of a summary judgment motion the dispute which the Court can only presume exists regarding whether the aforesaid crediting of the $877,977.94 amount has actually occurred given that the Defendants have yet to provide proof as to such crediting. The Court must presume the existence of such a dispute because, although the Debtor's counsel does not appear to have pled the existence of such a dispute, the Court observes that (a) the Debtor's counsel appears to misconstrue entirely what the Defendants have argued with respect to the $877,977.94 amount, and (b) the principal officer of the Debtor, at a deposition the transcript of which is relied upon in part by the Defendants in support of the instant summary judgment motion, denies any knowledge as to whether, and in fact appears implicitly to deny that, such crediting of the $877,977.94 amount has ever occurred, see Ex. 3 to Defs.' Summ. J. Mot.—Ross Dep. Tr. at pp. 144–145. As for the Defendants' argument that they are entitled to the entry of a summary judgment regarding the $877,977.94 amount because of the Debtor's concession that it owes the Defendants $1,120,365.90 for pre-Closing Date accounts receivable of the Debtor that the Debtor collected after the Closing Date, the Court rejects such argument since, as the Court understands it, the Defendants' right to pre-Closing Date accounts receivable of the Debtor, whether collected by the Defendants themselves or by the Debtor, is ultimately limited to an amount equal to the Debtor's total net indebtedness to the Defendants, see Stock Purchase Agreement ¶¶ 4.2 & 4.3, which amount has yet to be determined—given the open issue as to what, if any, net amount is presently owed by the Debtor to the Defendants, the Court cannot presently allow the Defendants to simply offset such $1,120,365.90 figure against the $877,977.94 amount.

Regarding the Debtor's $229,193.77 claim for "LDC balancing adjustments," the entry of a summary judgment in favor of the Defendants is presently premature, and thus may not presently be had, if for no other reason than that (a) the Defendants present their own claim for "LDC balancing adjustments" as part of their $808,925.86 Proof of Claim, (b) the Debtor has objected to such Proof of Claim, (c) the Debtor's $229,193.77 "LDC balancing adjustments" claim appears to be interrelated with, indeed likely can be used as a setoff or recoupment defense to, such Proof of Claim, for which Proof of Claim—which also comprises Count 1 of the Defendants' counter-complaint—the Defendants do not presently seek the entry of a summary judgment, and (d) the Court does not wish to presently rule "in a vacuum" regarding only one of the instant parties' "LDC balancing adjustments" claims. The Court also denies the Defendants' summary judgment motion respecting the Debtor's "LDC balancing adjustments"

claim because the Court concludes that, the contrary pleas of the Defendants notwithstanding, it cannot presently determine whether the Debtor can establish its $229,193.77 "LDC balancing adjustments" claim without the benefit of the documents that, arguably through its own fault, the Debtor has failed to obtain through discovery.

Finally, the Court must deny the Defendants' summary judgment motion with respect to the $12,064.83 amount that the Debtor seeks in its Count 2 for certain credits taken by customers of the Debtor that the Debtor contends should properly be chargeable to the Defendants (hereafter "the Customer Credits"), and notwithstanding (a) the Debtor's concession that it owes the Defendants $30,234.05 for items similar in nature to the Customer Credits (hereafter "the Customer Payments"), and (b) the Defendants' apparent offer, as implied at the bottom of page 12 of their reply to the Debtor's opposition brief, which reply was filed on July 31, 2003, to perhaps admit the truth of—and thereby arguably remove any dispute regarding—what the Debtor ultimately contends regarding the Customer Credits and Customer Payments, that is that the Debtor owes the Defendants a net amount of $18,169.22 (i.e., 30,234.05—12,064.83) for the Customer Payments. The Court is constrained to so deny the entry of a summary judgment in the Defendants' favor for such $18,169.22 because the Court, even in the face of the Defendants' apparent position that they agree with the Debtor that they are owed such $18,169.22, remains unconvinced that the Defendants do not actually seek the recovery of more with respect to the Customer Payments via the Defendants' $808,925.86 Proof of Claim, which proof of claim, as set forth above, is objected to by the Debtor.

**IV.**

■ The Debtor, in its Count 3, seeks to recover $410,979.48 in profits that it alleges the Defendants should have paid, but nevertheless failed to pay, to Volunteer–Phoenix prior to the Closing Date pursuant to the Operating Agreement and another contract entitled "Gas Supply and Services Agreement" (hereafter "the Unpaid Profits"). The Defendants contend that they are entitled to the entry of a summary judgment in their favor with respect to the entirety of such count for several reasons, and alternatively that summary judgment is warranted with respect to at least 80% of the relief sought by the Debtor in such count, or $328,783.58.

In particular, the Defendants contend that (a) the Debtor lacks standing to pursue its claim for the Unpaid Profits, apparently on the basis that the Debtor lacked any ownership interest in Volunteer–Phoenix when Volunteer–Phoenix' alleged right to the Unpaid Profits accrued, (b) the operation of § 5.4 of the Operating Agreement essentially defeats the Debtor's claim in any event because, argues the Defendants, such section, presuming *arguendo* that such unpaid profits existed, required, before such profits could be paid out to shareholders, either their reinvestment into Volunteer–Phoenix or their use in the satisfaction of advances that had been made to Volunteer–Phoenix by the Defendants, (c) the Unpaid Profits essentially constitute "lost profits," which profits could not have been recovered by Volunteer–Phoenix from the Defendants in any event pursuant to limitation of damages clauses contained within the Operating Agreement and the Gas Supply and Services Agreement, and (d) 80% of the Unpaid Profits cannot be recovered in any event because, if the Unpaid Profits actually were a receivable that was due to Volunteer–Phoenix on the Closing Date, then (i)

Volunteer–Phoenix' retained earnings as of such date would now need to be increased to reflect additional income in the form of such profits given that such additional income was never recorded on the books of Volunteer–Phoenix prior to the Closing Date, (ii) the Initial Purchase Price, pursuant to the Stock Purchase Agreement, would necessarily have to be adjusted upward by adding thereto an amount equal to the product of .80 and the amount by which Volunteer–Phoenix' retained earnings improved due to the crediting of the Unpaid Profits (i.e., $410,979.48), or $328,783.58, and (iii) the Debtor, via the Stock Purchase Agreement, would become liable to the Defendants for payment of the $328,783.58 increase to the Initial Purchase Price, which latter liability may be set off against any liability of the Defendants for payment of the $410,979.48 in Unpaid Profits.

Of the four arguments by the Defendants recounted by the Court in the preceding paragraph, the Court finds merit with respect to only the last of such arguments. However, the Court accepts such argument for which it finds merit and shall, accordingly, grant summary judgment to the Defendants regarding the Debtor's Count 3 to the extent of $328,783.58. Such action by the Court is also necessitated given the Debtor's oral stipulation at the close of the August 27, 2003 summary judgment hearing to the effect that the Defendants are entitled to set off as a claim against any liability that they might have for payment of the $410,979.48 in Unpaid Profits $328,783.58 that would then be due them for a corresponding increase to the Initial Purchase Price. For the reasons set forth below, the Court rejects the first three arguments offered by the Defendants as cause for the grant of their summary judgment motion respecting the Debtor's Count 3; accordingly, the Court shall deny such summary judgment motion to the extent of the remaining 20% of the relief sought by the Debtor in its Count 3, or $82,195.90.

■ First, the Court must reject the Defendants' argument that the Debtor lacks standing to pursue its claim for the Unpaid Profits because (a) the Debtor presently owns, and owned when it commenced the instant adversary proceeding, all of the stock in Volunteer–Phoenix, which latter entity was ultimately merged into the Debtor, (b) the Debtor thus owns, and owned when such proceeding was commenced, all of Volunteer–Phoenix' assets, including any right of Volunteer–Phoenix to pursue recovery of the Unpaid Profits, and (c) the Debtor, in its Count 3, asserts, as the owner of Volunteer–Phoenix' assets, Volunteer–Phoenix' right, whatever it may be, to recover the Unpaid Profits, thereby vesting the Debtor with standing to pursue its Count 3.

■ Second, the Court, at the summary judgment stage, cannot rule that the operation of § 5.4 of the Operating Agreement precludes recovery by the Debtor of the Unpaid Profits because a genuine dispute exists as to the applicability of such § 5.4 to such profits, including, in particular, whether, presuming *arguendo* that such unpaid profits existed, the same could have been used to satisfy advances that had been made to Volunteer–Phoenix by the Defendants. The Court notes, however, that, if the Unpaid Profits could not have been utilized to satisfy such advances, then the Defendants cannot obtain summary judgment in their favor by arguing that such § 5.4 mandated reinvestment of such profits in Volunteer–Phoenix' operations unless such reinvestment, in fact, actually occurred—indeed, presuming that Volunteer–Phoenix and, thus, the Debtor is otherwise entitled to recovery of the Unpaid Profits, presuming *arguendo* their

existence, the Debtor must prevail with respect to recovery of 20% of the relief sought in its Count 3 if (a) such profits could not have been utilized to pay the aforesaid advances and, instead, were required to have been reinvested in Volunteer–Phoenix' operations, and (b) such reinvestment did not, in fact, occur.

 Finally, the Court rejects the Defendants' argument that the Unpaid Profits constitute "lost profits" such that their recovery is contractually barred pursuant to limitation of damages clauses contained within the Operating Agreement and the Gas Supply and Services Agreement. The Court so rules because (a) the Court, as a matter of law, construes the damages limitation clause that appears in the Operating Agreement, which clause bars the recovery of "lost profits of any kind or nature whatsoever," *see* Ex. 4 to Defs.' Summ. J. Mot.—Operating Agreement § 10.10, such that the same bars the recovery only of profits that constitute indirect, consequential, or special damages but not those that constitute direct damages, that is damages in the form of profits that are contractually due under another clause of the Operating Agreement, (b) the Court, as a matter of law, construes the damages limitation clause that appears in the Gas Supply and Services Agreement, which clause does not explicitly bar the recovery of "lost profits" and only explicitly bars the recovery of "special, indirect, incidental or consequential damages," *see* Ex. 5 to Debtor's Resp. in Opp'n to Defs.' Summ. J. Mot.—Gas Supply and Services Agreement ¶ 8, in a manner identical to the damages limitation clause contained in the Operating Agreement, and (c) the Unpaid Profits represent not indirect, consequential, incidental, or special damages but rather direct damages in the form of profits that are allegedly due under other clauses of the Operating Agreement and/or the Gas Supply and Services Agreement.

## V.

Because the Court denies the Defendants' summary judgment motion to the extent that the same pertains to the Debtor's Count 2 and $82,195.90—i.e., 20%—of the relief sought in the Debtor's Count 3, and since the Debtor, via its Count 4, seeks to do nothing more than to hold the Defendants liable on a successor liability theory for the relief that the Debtor seeks via its first three counts, the Court shall deny the Defendants' summary judgment motion as it regards such Count 4.

## VI.

 The Defendants, in their Counterclaim 3, which counterclaim is identical to their $132,276.10 Proof of Claim, bring a $132,276.10 claim for indemnification against the Debtor pursuant to § 4.7 of the Stock Purchase Agreement. Such § 4.7 obligates the Debtor to assume an acknowledged obligation of the Defendants to issue 2 ½% of the capital stock of Volunteer–Phoenix to an individual named Korandovich (hereafter "Korandovich") and to indemnify and defend the Defendants "from any obligations or liabilities to Korandovich ... resulting from ... [the Debtor's] failure or refusal to fulfill such ... stock issuance that may be requested by Korandovich."

The parties do not dispute that the Debtor never issued any of Volunteer–Phoenix' stock to Korandovich. The parties also agree that (a) Korandovich commenced an action against the Defendants in the U.S. District Court for the Southern District of Ohio subsequent to the Closing Date (hereafter "the Ohio District Court Action"), (b) the Defendants filed a third party complaint against the Debtor within the confines of the Ohio District Court

Action, (c) the Defendants asked the Debtor to defend the Defendants in the Ohio District Court Action, and the Debtor refused to so defend, (d) the Defendants subsequently settled the Ohio District Court Action with Korandovich, and (e) the indemnification which the Defendants seek from the Debtor in their Counterclaim 3 is for the amounts that they expended in settling the Ohio District Court Action with Korandovich. However, the parties disagree, *inter alia*, whether (a) Korandovich's claims in the Ohio District Court Action are covered by the Debtor's indemnification/defense obligation as set forth in § 4.7 of the Stock Purchase Agreement, and (b) the settlement of the Ohio District Court Action between the Defendants and Korandovich is reasonable.

■■■ In order for the Defendants to prevail on their indemnification claim as against the Debtor, the Defendants must prove, *inter alia* and of course, that the underlying claims for which they seek indemnification—i.e., those that were pursued against them in the Ohio District Court Action—are covered by the indemnification language of § 4.7 of the Stock Purchase Agreement.[3] Also, because the Defendants settled the Ohio District Court Action rather than making payment to Korandovich under compulsion as a result of the entry of a judgment against themselves, the Defendants, in order to succeed on their indemnification claim, must prove that (a) they were liable to Korandovich for the underlying claims that he pursued in the Ohio District Court Action,[4] and (b) the settlement of such action was reasonable. *See Convention Center Inn, Ltd. v. Dow Chemical Co.*, 70 Ohio App.3d 243, 590 N.E.2d 898, 900 (1990); *LoPresti v. TransOhio Savings Bank*, 1992 WL 126033 at *5 (1992); *McClure v. Deerland Corp.*, 401 Pa.Super. 226, 585 A.2d 19, 22 (1991); *Sun Co., Inc. v. Carboline Co.*, 1992 WL 252265 at *1–2 (E.D.Pa.1992).

The Court holds, as a matter of law, that the claims raised within the Ohio District Court Action come within the coverage of the indemnification language of § 4.7 of the Stock Purchase Agreement only if such claims were brought by Korandovich as a result of, and so as to redress, the Debtor's failure or refusal to fulfill its obligation to issue 2½% of Volunteer–Phoenix' stock to Korandovich. The Court must deny the Defendants' summary judgment motion regarding its Counterclaim 3 if for no other reason than that the Court cannot presently determine whether, and thus cannot presently rule that, Korandovich advanced his claims in the Ohio District Court Action as a result of, and so as to

---

**3.** Indeed, that the underlying claim for which an indemnitee seeks indemnification comes within the coverage of an indemnification agreement is sometimes even formally stated as, notwithstanding that it is necessarily always implied to be, an element of an indemnitee's cause of action for contractual indemnification as against an indemnitor. *See McClure v. Deerland Corp.*, 401 Pa.Super. 226, 585 A.2d 19, 22 (1991); *Sun Co., Inc. v. Carboline Co.*, 1992 WL 252265 at *1 (E.D.Pa. 1992).

**4.** The law, at least in some jurisdictions, is that "when the indemnitor has notice of the [underlying] claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and *the indemnitee need only show potential[, rather than actual,] liability*" in order to prevail on an indemnification claim. *See* 41 Am.Jur.2d *Indemnity* § 46 (2003) (citing cases from several jurisdictions). Given the present existence of other disputes that impact the outcome of the Defendants' indemnification claim in its Counterclaim 3, the Court need not and, thus, will not presently resolve whether, as a matter of law, the Defendants (a) must provide a showing of actual liability with respect to Korandovich's claims, or (b) need only satisfy, instead, a lesser standard of potential liability regarding such claims.

redress, the Debtor's failure or refusal to fulfill its obligation to issue 2 ½% of Volunteer–Phoenix' stock to Korandovich. The Court rules as it does because an examination of the four counts of Korandovich's amended complaint filed in the Ohio District Court Action reveals, or would appear to indicate, that (a) Korandovich sought as relief therein not the issuance of 2½% of Volunteer–Phoenix' stock but rather 2½% of the proceeds that the Defendants obtained from their sale of such stock to the Debtor, *see* Ex. 3 to Defs.' Reply to Debtor's Resp. in Opp'n to Defs.' Summ. J. Mot.—Korandovich Amended Complaint, p. 8 (Prayer for Relief ¶ 2), (b) Korandovich's various legal theories for the recovery of such relief were each predicated not upon a simple failure by either the Defendants or the Debtor to issue such stock but rather upon the Defendants' failure either to issue such stock to Korandovich prior to its sale to the Debtor or to convey 2 ½% of the aforementioned sales proceeds to Korandovich, *see* Korandovich Amended Complaint ¶¶ 23, 24, 26, 27, 31 & 37, (c) Korandovich did not advance his claims in the Ohio District Court Action as a result of, and so as to redress, the Debtor's failure or refusal to fulfill its obligation to issue 2½% of Volunteer–Phoenix' stock to Korandovich, (d) the claims raised within the Ohio District Court Action do not come within the scope of the indemnification language contained in § 4.7 of the Stock Purchase Agreement, and (e) the Debtor, if anything, is the party that is entitled to the entry of a judgment in its favor with respect to Counterclaim 3.

The Court also will not presently resolve whether the Defendants' settlement with Korandovich of the Ohio District Court Action is reasonable because (a) the Defendants have neither disclosed to the Court the terms of, nor submitted for the Court's review the agreement that effectuated, such settlement, and (b) the Court cannot resolve the issue of such reasonableness absent such disclosure or review of such agreement (hereafter "the Settlement Agreement"). Of course, since an open issue remains as to the reasonableness of such settlement, the Defendants' summary judgment motion as the same pertains to its Counterclaim 3 cannot presently be granted. In a related regard, the Court is cognizant of (a) the Defendants' notice to the Court that the Settlement Agreement is subject to a confidentiality provision, (b) the Defendants' position that, as a result of such confidentiality requirement, they were precluded, during the course of the Court's consideration of their summary judgment motion, from disclosing settlement terms or submitting to the Court as an exhibit a copy of the Settlement Agreement, and (c) the Defendants' offer to provide the Court with information as to settlement terms under seal and/or for an *in camera* review of the Settlement Agreement upon the Court's request. However, the Court concludes that the aforesaid confidentiality concern of the Defendants cannot affect the Court's decision to deny the Defendants' summary judgment motion as the same pertains to the Defendants' indemnification claim because (a) the Defendants, as the party moving for such summary judgment, bear the burden of proving that they are entitled to a judgment as a matter of law, which burden they cannot carry unless they (i) prove that their settlement with Korandovich was reasonable, and (ii) consequently place before the Court either the terms of such settlement or a copy of the Settlement Agreement, (b) the Defendants, in order to prevail on such summary judgment motion, thus needed to affirmatively seek, rather than merely to offer, to place before the Court either the terms of such settlement or a copy of the Settlement Agreement, which action the Defen-

dants failed to take, and (c) such summary judgment motion, in any event, must be denied on a basis separate and apart from the issue of reasonableness vis-a-vis the settlement between the Defendants and Korandovich, namely that the Defendants have presently failed to establish that Korandovich's claims against the Defendants are covered by the indemnification language contained in § 4.7 of the Stock Purchase Agreement. As an aside, the Court notes that, because the Defendants also bear the burden at trial of establishing the reasonableness of their settlement with Korandovich in order to prevail at that time upon their Counterclaim 3, it will be incumbent upon the Defendants at that time to affirmatively seek to place before the Court either the terms of such settlement or a copy of the Settlement Agreement—the Court certainly does not intend itself to make an independent request of the Defendants that either be provided to the Court.

Because the Court identifies at least two separate grounds for denying the Defendants' summary judgment motion as the same pertains to Counterclaim 3, the Court need not and, thus, will not presently engage in an analysis of the many other arguments that the Debtor advances in opposition to such Counterclaim; however, the Court will note summarily that many, if not all, of such other arguments are largely devoid of merit.

## VII.

**IN SUMMARY,** (a) the Defendants' summary judgment motion is **GRANTED** with respect to (i) the Debtor's Count 1, and (ii) the Debtor's Count 3 but only to the extent of $328,783.58—i.e., 80%—of the relief that is sought therein, and (b) the Defendants' summary judgment motion is **DENIED WITH PREJUDICE** with respect to (i) the Debtor's Count 2 and 4, (ii)

the Debtor's Count 3 to the extent of $82,195.90—i.e., 20%—of the relief that is sought therein, and (iii) the Defendants' Counterclaim 3.